Case No. 21-5176, et al., Donald J. Trump, et al., A balance v. Mazars USA, LLP, and Committee on Oversight and Reform of the U.S. House of Representatives. Mr. Norris for the A balance, Mr. Letter for the affiliate, Committee on Oversight and Reform of the U.S. House of Representatives. Good morning, counsel. Mr. Norris, please proceed when you're ready. Good morning, Chief Judge Scherner-Boston. May it please the Court. The Committee says it needs a detailed understanding and full accounting of President Trump's finances in order to legislate. No prior Congress has demanded this kind of information, but every future Congress will if this Court upholds the subpoena. There's no principled way to limit the fallout to President Trump. Every House will be able to cite something supposedly unprecedented about every President to justify intrusive subpoenas to him, his family, and his businesses. That result would be a major departure from our constitutional tradition. One way to stop it is to clarify that these subpoenas must satisfy heightened scrutiny. But heightened scrutiny won't mean anything unless this Court also holds that this subpoena fails it. If heightened scrutiny means anything at all, it means that the Committee must consider the broad reforms it's already identified without every shred of President Trump's financial information. It also means that the Committee cannot go combing through his finances in the hopes of finding unknown errors that might inspire unknown legislation. Counsel, can I just ask you about the contention that these kinds of subpoenas must withstand heightened scrutiny? I'm curious about the application of that principle in the context of a former President. Why is it that you say that heightened scrutiny applies under these circumstances? So, we have arguments that you should treat this as a subpoena that was issued in 2019. I'm sorry, I couldn't quite hear you. We have arguments that you should treat the subpoena as if it was issued in 2019, but I'll set that aside for a moment and answer your direct question. If this is a subpoena to a former President, in the peculiar circumstances of this case, it's still to get full heightened scrutiny under Mazar's. And the reason is, the holding of Mazar's was that this type of subpoena receives heightened scrutiny because it's suspicious. It comes from a rival. It asks for personal papers that have a less evident connection to legislation. It asks for sensitive information that could be quite damaging and used for harassment. The Court said all of that about this exact subpoena. Can reissuing it verbatim in 2021 not possibly cleanse it of the suspicious qualities that trigger heightened scrutiny in the first place? Oh, I'm sorry. I didn't appreciate that from the Supreme Court. I thought they were talking about the separation of powers and the concern that Congress would have some leverage over a sitting President. And that it was sort of a separation of powers kind of issue as opposed to necessarily something wrong about the nature of the subpoena or the Congress that was issuing it. Well, I think the Court said both. So, of course, any subpoena to a sitting President is going to trigger Mazar's. We agree with that. But, my friend, really the debate in Mazar's was whether there's something about this subpoena that makes it not suspicious or does not trigger the separation of powers. And the Court said, no, this specific subpoena is also problematic because it seeks – I think it said we would have to be blind not to see that this is a clash between rivals over records of President Trump's finances that are of intense political interest. But it is rival branches, right? It's not rivals. It's rival branches. Right. The case was about – the case was decided when he was President. But I think the animating principle, why would you subject these to heightened scrutiny, you know, normally Congress gets lots of deference, lots of presumptions in its favor when it issues subpoenas. And I think the reason the Court gave in the case was that there's something different about these that makes us not want to be so solicitous to Congress as we normally are. And it's not the fact that there were different branches at issue. I thought there was a constitutional principle that the Supreme Court was trying to articulate, not a political one, about the fact that we might have people from different political parties involved. And the latter is what you seem to be focused on. Well, you know, it wouldn't just be politics. Politics would not be enough to trigger heightened scrutiny. But President Trump, you know, the target of the subpoena was former President. And the important part about this case is this subpoena was issued while he was President. It is an unusual case. I'm sorry. So my question wanted to focus on former President. And your answer seemed to be there's something suspicious about this subpoena. And I'm trying to sort of flesh that out because I didn't see that in the Supreme Court's opinion in the same way that you did. So can you tell me, are we looking at certain subpoenas differently than we would other subpoenas because there's something suspicious about them? Is that what you're suggesting that the courts need to do? I think in the unusual circumstance where a President is subpoenaed while he was President, and Congress continues to pursue that investigation while he leaves office, you're going to have whatever separation of powers concerns were with the original subpoena, they don't go away because it was reissued. But what are they? That's the question. What are the concerns in the aftermath? I understand. So really it's, you know, there's a chilling effect. What happens to you after you leave office can affect how you deal with Congress when you're in office. That's what Nixon v. Fitzgerald says. That's what Nixon v. GSA says about executive privilege. The same is true of intrusive demands for your personal papers. It would affect how you deal with Congress if you knew that they could expose your entire financial history to the public as soon as you leave office. That threat would loom large over everything you're doing. It also would allow Congress to influence who can run for President, who can be President. They would be allowed to expose this type of information to influence that process as well. But you're assuming that's the intent or the motivation or what Congress is trying to do. And I guess that's the part that I'm a little unsure of. I mean, I'm worried about another kind of separation of powers problem, I think, which is applying heightened scrutiny to prevent Congress from doing its work. So I guess you would agree with me, or I assume you would agree with me, that Congress has a duty to protect the Republic from threats, both foreign and domestic. Is that pretty well established? I think so. So in a situation in which Congress perceives that there may have been threatening behavior, misbehavior problems in the White House, one would think that in the aftermath of that administration, that is exactly the time in which Congress would be evaluating whether the legislative scheme was sufficient to prevent that sort of thing from happening in the future. And what I'm worried about is that when we apply heightened scrutiny in the aftermath to prevent Congress from getting the precise kinds of information that it would need to shore up its legislation to prevent those kinds of threats, you've actually created a problem in which the executive is encroaching on the prerogatives of Congress. So can you speak to that? Can you give me the... Because we think about separation of powers traditionally as the other branches encroaching on the executive, or at least that's the way it's often pitched. But I think when we have co-equal branches of government, we also have to worry about whether the other branches are encroaching on the prerogatives of Congress. And so I'm concerned that when a president leaves and we're in the aftermath and Congress thinks there may have been a problem, just like they would in any other situation in which there's a problem, they have the duty to go in to find the information and to try to figure out whether there is legislation that can solve the problem. So why isn't that the situation here and don't we have a different kind of separation of powers issue? I understand all that, Judge Jackson. I don't disagree with a lot of that. But I think MAZARS, all we're asking for is application of the MAZARS test. MAZARS itself is a balanced approach. It takes account of the fact that there are some reasons to be suspicious of what's going on in these circumstances. But it also takes into account the fact that Congress might need information to legislate. But if MAZARS is with a sitting president, then that makes sense, right? The balance is the concern that Congress is swooping in while the president is in office. And so we have to apply this heightened standard in that situation because it really does impinge or could impinge on the executive. I'm talking about the aftermath. What's the justification for applying a heightened standard to prevent Congress from doing the kind of work it would ordinarily do to evaluate legislative options in the aftermath? Sure. And so I have to quibble that this is a subpoena that came, that they patiently waited until he left office and then subpoenaed him then. I mean, they subpoenaed him while he was in office. My friend will tell you that they can satisfy the MAZARS test, which means they think you can do this to a sitting president as well. So the stakes are a little different in this case. But Nixon versus Fitzgerald says that presidents are tempting targets. That's a case about a former president who was sued for something he did well in office. They're tempting targets. As soon as they leave office, they're still the most recent rival of Congress. Congress can legislate, of course, but Congress in our entire history has never thought that it could subpoena a decade's worth of a president's financial information and expose it to the public. This subpoena is just a particularly bad example for the serious concern that Your Honor raised. If you didn't have the subpoena pending at the time that the president was in office and the committee waits until after the president leaves, so it's a former president from the beginning, then would you still be making the same argument? You would in this case, and there's a couple of special features here. My friend would tell you that President Trump received the subpoena because he was president. He would never have gotten it if he never served. So it is about the branches still. And the thing that they claim to be studying is legislation that would restrict the president's powers. There's still an interbranch conflict in this case, given the rationales that they've asserted. And this is not forever going to hamstring, and in other cases involving other subpoenas, Nixon versus GSA says the separation of powers concerns that apply to former presidents erode over time. Right. There's zero time that has passed here. As soon as he left office, that's when the subpoena was issued. It was issued because he was president. It was issued while he was president. And it was issued in order to study legislation that would restrict the president's— But this court got into some of this in the Thompson decision that came down last week. And in a situation in which the subpoena only arises after the president has left office, then there is another president who's in office at that time. Correct. So the considerations in terms of the separation of powers between the branches shifts because you do have the executive and the legislature, and the person who's the subject of the subpoena and the entities associated with that person are neither of those. Correct. That's a difference. But, you know, we're talking about a chilling effect on the current incumbent's operations vis-a-vis Congress. So that's what it really boils down to. And I think that that has some support, that you could have the overhang of a future subpoena affect the conduct of a sitting president. That, at least conceptually, is a separation of powers issue. But that seems to me to be where the focus of the argument for you would be, is that that's the separation of powers that continues to be implicated even after the president has left office. That's right, Judge Srinivasan. My point is really that in this case, there's no erosion, and he really should be up to a Mazar's level of scrutiny because it was issued while he was in office. It continued to be pursued because he held the office. But I would just note to that point, now this is not an executive privilege case where we sort of know the Biden administration's position because it didn't assert executive privilege over the materials. We don't know the Biden administration's position about this case. And, in fact, the last time the Justice Department spoke about this case, it submitted an amicus brief in our favor. I don't know if that helps you or hurts you. That's what I'm trying to figure out. All right, so we have a person who is now a private individual. He was a private individual before he became the president. He is now back as a private individual. And you seem to be trying to carve out a special status for him as a former or post-president that I haven't really seen in the same way in the law. And the other part that worries me, in addition to the separation of powers concerns, is whether that's really consistent with the rule of law and the peaceful and full, complete transfer of power. That someone who, you know, used to be a private person becomes the president and returns to a private person is very fundamental in our constitutional system. And yet somehow now you say if a subpoena comes to him in his post-presidency and the legislature establishes a reason for it, I know that you quibble with whether or not it's a good reason, but they have a reason, and they would ordinarily be able to get this kind of information, we should still say that they can't get it from him. And I'm trying to understand why that is. What makes him so different or special that he gets this kind of accommodation that other people in private life don't? So this court in the public citizen case, I believe we cite in our brief, says former presidents do retain some aspects of their prior office. There's a DDC opinion called Poindexter that says at least when Congress is, you know, investigating presidential matters, former presidents, disputes with former presidents still do implicate the separation of powers. And I admit that Nixon versus GSA says that those concerns erode over time. And so if this was a subpoena to three presidents ago, we may not be having this discussion. This one, there's been no erosion, and, you know, they're still trying to investigate president-specific matters. And that's the difference to us. Even though they're personal papers of his, they're not presidential papers? It's not a personal subpoena. This is not a subpoena that they issued to, you know, say, real estate developers. Then he became president and they had to put it on hold. Now they're back to investigating real estate. This is a subpoena about the presidency because he was president. This is a particularly good example of why former presidents are not exactly treated like private citizens, at least in this limited circumstance. Well, let me ask you then, the district court, I think, was sensitive to arguments you're making regarding one tract of this subpoena. And as I understand, he embraced the ideas that you have been discussing so far this morning, at least to the financial tract, and pointed out that, you know, current ethics laws require the disclosure of so much information before one is a president, when one is a candidate, and then, of course, upon becoming president, and then periodic updates while president. So why isn't the effort of the district court to address points that you're making reasonable here? Basically saying, have tons of information already, or at least the law requires that a lot of personal financial information be disclosed. That as to the other two tracts, there is a different way to look at those tracts, and the district court did. Is your position, and I understand your first position is it's all or nothing, but suppose you had to consider the various tracts of this subpoena. Would that make any difference to your argument? Judge Rogers, our position is that you can't look at the separate tracts. You look at the subpoena. The subpoena implicates separation of powers or not. That's what the Supreme Court did in Mazars. It was fully aware of what it called the broad legislative objectives, including the GSA rationale and the emoluments rationale. Counsel, I know you don't want to accept the premise of the question, but the premise of the question was, as to the financial papers, I thought the district court was taking into account the very types of arguments you're making today with respect to everything requested by the subpoena and tried to draw a distinction. And I understand your first line of argument is can't do that, but I'm pressing you. Suppose the court decides it is appropriate to do that for some of the reasons that the other judges, my colleagues, have raised this morning. What would your response be? Anything particular? Well, Judge Rogers, we think that these tracts fail even the ordinary standard that would apply to private citizens. But I would note that no one in this case is arguing that that standard applies. The committee says you should apply Nixon versus GSA, which is a form of heightened scrutiny. It may not be as heightened, but it's a form of one. The Department of Justice, in the parallel federal tax returns case, says you should apply Mazars light across the board in that case, which is a concession that separation of powers are involved here. But, you know, if you're applying some form of heightened scrutiny, wherever you fall on the scale, we still think those rationales, which I believe you're referring to the GSA rationale and the emoluments rationale, those still fail the factors that you would consider under any version of heightened scrutiny. And I'm happy to go through those rationales independently. And by that, you're equating that with the Mazars test. Am I correct? In other words, you're not saying more than Mazars. Correct. Correct. Under Mazars, I mean, look at the one of the easiest examples of this is my friend says that the committee is studying the bidding process for the GSA lease. It's also studying whether President Trump may have made misrepresentations on specific certifications from 2013 to 2016 that were made part of the leasing process. They say they're studying emoluments. This subpoena doesn't ask for documents that went into the bid. It doesn't ask for documents that went into the certifications. It doesn't ask for emoluments. However you define emoluments, it's not limited to those investigations at all. It's over-broadened. Can I ask about the financial disclosure? Correct. So on that one, here's the committee's argument, as I understand it, is that there are concerns that we have about the extent to which existing financial disclosure laws adequately capture the range of assets that a president may have. And this former president's complicated financial arrangements highlight that, and we need to be sure that our disclosure statutes adequately capture the full range of possibilities that a president, in terms of the financial arrangements that a president might have. The best way to know whether we're capturing those is to look at possible, and I think the committee would say in this view, the source of assets that that president has. And the only way we can understand that is to look at the underlying financial papers so we can get a good read of what's going on, and that will inform us as to the kinds of revisions that we may need to implement vis-a-vis financial disclosure going forward for future presidents. What's wrong with that? May I answer? Yeah, yeah, definitely. So under heightened scrutiny, any form of heightened scrutiny, one problem with that is the Supreme Court told you you need to consider the opportunities for institutional advantage and the long-term incentives. The problem with that disclosure rationale is it's utterly limitless. You could say we are considering gaps in so-and-so disclosure law, or we want to pass a new disclosure law that says presidents should have to disclose their medical records because we're concerned about their health and office. And because we're concerned with that, we want to see this president's medical records or financial records or tax records or anything to study disclosure laws. You could say that about anything. Go ahead. I'm sorry. I was just going to quickly ask, does it matter whether they say that and they have the same broad subpoena in the wake of evidence about certain kinds of problems? So it's Chief Judge Srinivasan's example, but instead of just saying we think there are gaps in financial disclosures, they point to a number of times during the Trump administration in which information came to light about his finances or about business arrangements that they think could possibly pose ethics problems, but that weren't disclosed in his financial disclosures. So we have a context in which it's not like they just woke up one morning and said, let us study something. They say here's a bunch of ways in which this president's dealings in particular raised some red flags for us about ethical problems. And so what we need to do is see what his records show so that we can legislate about that. Does that make a difference? It might. The Thompson case from this court a few days ago said it emphasized that the court thought that there was an actual predicate for the committee. So that is what you have here because I think the committee has laid out what it thinks is a factual predicate for undertaking this inquiry. And then so if that's the case, then what's wrong with that sequence of analysis to get to the conclusion that the committee wants to urge on us, which is that that means that at least under the financial disclosure rationale, we should have access to financial statements so that we can figure out what kind of legislative amendments we may need to implement. So at least under heightened scrutiny, that evidence is subject to judicial review. That evidence is nonexistent in this case. The committee says, and I think this is the sum total of the evidence, that there was a loan to Michael Cohen in 2017 that was not disclosed and it was later disclosed. But they've submitted a separate request for that information, and this subpoena has nothing to do but not reveal any information about what happened there. It's not calculated to at all. The other evidence is that Michael Cohen said that when you were a private citizen, you may have inflated or deflated assets when you were bidding for the Buffalo Bills or when you were talking to New York tax authorities. Then they're using that to say, well, if he did that there, he must have done it on his financial disclosure reforms without pointing to anything on the financial disclosure reforms that is even suspicious. And if you were worried about the financial disclosure reforms, which I think we can all agree that the committee has no legitimate interest in figuring out whether the representations to the Buffalo Bills were accurate or not. It has to be about what he told the public in his financial disclosure reforms. This subpoena doesn't say, give us the source documents that go into the financial disclosure reforms so we can test their accuracy. It goes all the way back to 2011 and tries to test the accuracy of those financial statements he made when he was a private citizen that the Mazars drafted up for him. It doesn't – Well, suppose then that they were pared back to in terms of the temporal part of it so that it coincides with the financial disclosures that are required by existing law, so I think which would start in 2014. That's right, 2014, 2015. I think that's – Okay, so whichever the year is. So suppose it were at least pared back to that. At that point, I take it the committee's rationale is, well, in order to understand what the potential gaps might be, we need to have a full picture of what the president's financial assets and liabilities were. Otherwise, we can't know what the disclosure laws are missing. There's two parts of that. One is they've already identified some of those possible reforms that maybe you should have to dispose exact amounts instead of broad ranges. Maybe we should require you to talk about your closely held businesses. They've already identified the reforms, and the facts you need to know whether that was implicated by President Trump are known, and they believe them, and they already know them. It seems to me that happens all the time with legislative inquiries. There's definitely going to be suppositions based on evidence that there are certain amendments that may be in order, but it's always fruitful to know more to get a better picture and to get a full analysis of the sorts of things that may be missing. Tight and scrutiny, so he's the last place you should turn, not the first. Our submission is that those reforms they've already identified, they're policy judgments. I don't even know what the specifics of President Trump's finances would tell you. It's a policy judgment about whether future presidents, not him, future presidents should have to disclose this kind of information, whether that's too burdensome, whether the public has a right to know that. But isn't the disclosure also connected to other kinds of concerns that Congress would have? Not just the sort of generic policy determination of whether people should know these things about his businesses, but Congress has an interest at least in the sort of foreign emoluments problem, right? And I understood that disclosures were somewhat connected to that as well, that the president has to explain who he's getting gifts from or money from or should under the law, and Congress is exploring that. They also say with respect to the GSA issue, and I know we sort of shifted to finances, but back to GSA, I had understood that part of their rationale was wanting to have tighter oversight over the GSA itself because of the concern that there might be self-dealing going on since the president uniquely is the boss of GSA and is undertaking to also hold these leases. So coming in on that one in particular, I'm trying to understand how they could get the information they need from elsewhere when they're talking about a unique scenario in which the president is holding leases that GSA administers and there's a change of position within GSA that corresponds to the change in administration concerning his ability to hold the lease, et cetera. Do you concede that they have some basis legitimately for looking into those records at least? Absolutely not, Judge Jackson. This is the worst example of where they don't have any evidence. They say that President Trump may have misrepresented information in his bid for the lease in 2011 and then potentially when he certified his net worth in 2013 to 2016, but there's no evidence for that whatsoever except Michael Cohen's testimony about entirely different transactions involving the Buffalo Bills in New York. It's not about the lease at all. There's no evidence. I don't understand what you mean. My question is GSA is an agency that Congress has oversight with respect to, and GSA also reports to the President of the United States. And to the extent that we have a president unique in all of American history who is retaining or maintaining a lease of property that is leased by the GSA, Congress now, this committee, says we would like to see the information that GSA was given by this president about his financial position, about whatever, to secure this lease because we may need to change our legislation in the future to the extent that we think as a policy matter that presidents should not be allowed to lease out federal property. So I don't know what that has to do with the Buffalo Bills, but I'm trying to understand why that isn't a legitimate inquiry of Congress and why at the very least they shouldn't have access to the records that the president provided to substantiate his lease bid in this situation. That's exactly right, Judge Jackson. They may have an interest in the documents that President Trump submitted to GSA. They have every single one of those documents already because they've asked GSA for them. They have them all. They're all posted on the committee's website. The financial statements that President Trump submitted, they have them already. They're posted. And the certifications themselves, anything that went into the bid, they all have that. It's all posted in public. They have that already. So your objection to this one is it's duplicative what they're asking for, that it's not necessary because they already have it. I'm objecting to really what they don't have yet, and what they don't have yet are source documents that would get into the nitty-gritty of exactly President Trump's entire financial situation from 2011 to 2018. They have statements that were made to GSA, and that's exactly what they need to legislate. If you think GSA's processes are insufficient, you would look to what was submitted to GSA, and you would study that and ask GSA what else would you need, why don't you ask for this, why do you ask for this. They have all of that information already. What's left is just, I guess, double-checking it against President Trump's entire finances for over nearly a decade's stretch. And just one last point, if I could, Judge Jackson, on GSA. You know, one thing that we agree about from this court's prior decision is what Judge Tatel called a statutory litmus test that it applied in that case. And what Judge Tatel was saying is that this subpoena, even under a pertinency standard, which applies to any individual in America, it's the lowest standard that exists in the law, even under a pertinency standard, this subpoena is only possibly pertinent to laws that would study presidential finances. And what he meant was it's not pertinent to laws that would just apply to ordinary executive branch employees or agencies. It has to be a law that, quote, apply, or laws that, quote, apply to presidents directly. The only thing they've ever identified for the GSA rationale is a law that would ban presidents from entering into leases with GSA. And there's just nothing about these records that helps you make an informed decision about that kind of legislation. Can I get back to something that is president-specific, which is disclosures? Or at least it could be president-specific, and there's been some president-specific legislation that's been identified that could be amended or enacted. As to that, is there anything in the scope of the subpoena that you think is fair game? Well, we have purpose-based challenges to the subpoena, but it's actually not about legislation. Right. So those are the kind of – they cut across everything, and they would just void it out of an issue. But just hypothetically assume that we're past that, and we're talking about the application of the MAZR standard to a subpoena that we think is adequately founded in terms of pursuing a valid legislative objective. Is there anything within the scope of the subpoena now that you think would be something that the committee could lawfully get? Sure. I think – I mean, I think under MAZR is no. That's my question. Yeah, under MAZR. So do you think MAZR means, even if we get past your threshold objection, that there's not a pursuit of a valid legislative objective? Do you think – if there is – if we think that amending the financial disclosure laws to address potential gaps is a valid legislative objective, and we think, contrary to your argument, that that objective, in fact, is in play here – I mean, it's not just a centrifuge or something else, but that's, in fact, in play here, at least we have to defer to the committee's statement that it is and its indication that it is – even if we're at that part of the analysis, do you think under the MAZR standard there's nothing in terms of the financial records that MAZR has vis-a-vis former President Trump that could be within the fold of a valid subpoena? So assuming away all of that, my last argument is that we at least deserve what every former president has gotten. The only two presidents we know about who complied with compulsory process from Congress are Tyler and Adams, and both were guaranteed confidentiality. And that's the very last argument that we have is that if this information is critical to legislating, because you need to know the exact amounts. You need to know how far back to go. You need every single detailed transaction. If that's true, you can do all that in camera. So do you think that if there were confidentiality, then the entire subpoena is fair game? I think if you assumed away all my prior arguments, then yes. That's what they need to legislate, but it dramatically decreases the burden on us. And this would be the first subpoena that a court has ever enforced that didn't guarantee that level of protection. Okay, so if there were confidentiality, then you think the entire subpoena is fair game vis-a-vis financial disclosures, giving away threshold arguments that you're preserving? Nothing before he filled out a financial disclosure. So 2011, 2012, 2013, certainly. Got it. So for the relevant years, it's temporarily pared back to the relevant years. Temporarily pared back and pared back to the information that goes into the financial disclosure. Not everything he's ever – every jot and tittle of every transaction he's engaged in. But as to that, I think the argument is that we don't know what's missing in terms of what should be in financial disclosures until we get a real assessment of what the financial statements contain. Because, yes, there are things that would go into the financial disclosure forms, but the whole point is, are there things that we ought to be asking for and we ought to make sure are within the fold of that to assure that we have accurate assessment of the president's assets and liabilities? And we can't know that until we get all the financial information. They do know that. They've identified and even passed several of those reforms in legislation already. But to the extent that the argument boils down to, we don't know what we don't know, so we need to go looking to find mistakes that we don't know about yet, to do reforms that we haven't thought about yet. That's the kind of reasoning that can't survive heightened scrutiny. It would justify – I think you can't survive it at that level of generality. That's got to be true. But if you have an adequate evidentiary foundation for thinking there may be a problem, that seems to me a little bit different. Because then it can't be that you have to know ahead of time once you've already identified a problem. Otherwise, you could never know the scale of the problem. So if you give on the notion that there's an adequate evidentiary foundation – and I know you don't, but I'm just asking you to accept a lot of premises that you are resisting for understandable reasons. If you give on that, then it seems to me that it can't be that what the committee can validly seek is only that which we already know goes into financial disclosures because there's got to be some zone for inquiry into what ought to be disclosed but never even was within the count. If we stipulate that the committee has a sufficient factual record to go looking, then at least the subpoena should be tailored to that factual record. This one is not. I believe they've identified closely-held businesses. They want to know the structure, potentially, of closely-held businesses. They want to look into loans that may or may not have been disclosed. Then issue a subpoena for loans or for what are your closely-held business structures. It needs to be some level of basic tailoring that are any version of financial disclosures. And then one last question along these lines. Suppose we reintroduce non-confidentiality, and so we don't say that everything is going to be held confidential. Then is there any document – if you accept all the other premises besides the confidentiality one – are there any documents that you think are within the fold of a valid subpoena? Sorry, if we assume that the documents are going to be publicly released. Exactly. No, I think at that point, the burden on the former president far outweighs. What is the burden? Do you mean the burden of looking at the – like, what burden comes from the lack of confidentiality? It's the violation of privacy, of confidentiality, of proprietary business information being published to the whole world at that point. And that, of course, burdens us, but the burden of an extremely painful subpoena increases the threat of that kind of subpoena to the incumbent. So the more you let Congress do to the former president, the more leverage they have over the current president because they can make this threat. So that doesn't immediately emerge from the language of Mazars in discussing the fourth prong, which is where burdens come into play, because the court says we've held that burdens on the president's time and attention stemming from judicial process and litigation without more generally do not cross constitutional lines. The burdens imposed by a confidential subpoena should be carefully scrutinized, but they stem from a rival political branch that has an ongoing relationship with the president. So it seems like the burdens that were foremost in the court's mind, at least, were not the ones that you're referring to now. It had to do with time and attention and burdens on the office of the president. Sure. I think they've said burden. I think any kind of burden is fair game under Mazars. The opinion concludes by saying these factors are not exclusive. The opinion starts by saying the reason President Trump cares so much about these documents is how sensitive they are. I think the court understood the dynamics at play. It wasn't concerned that President Trump was going to have to participate or thumb through the documents himself. I mean, they belong to a third-party account, which the court acknowledged but said is irrelevant to understanding the separation of powers dynamics. But he was a sitting president at the time it came down. This subpoena originally came down. He was. And how it applies to a former president is an open question. I mean, I think in the other case, the federal tax returns case, my friends at the Justice Department said we're on the frontier of the law here. It's a tough question, but the reasoning and the principles in Mazars, I think, point towards applying heightened scrutiny here as well. And this subpoena, which, of course, was drafted at a time when the House never imagined any kind of test like this would apply, failed to have standards. Well, of course, the Supreme Court was not solicitous to a former president's concern about the burden on his ability to carry out his duties while president. Isn't that correct? Correct. It wasn't a case about a former president. Well, Clinton v. Jones, all right, the court rejected that argument that the president had presented. So I think just Chief Judge's comment about you have to look at Mazars in terms of whether it was discussing the first factor as opposed to the fourth factor. Because the Supreme Court, I didn't read Mazars to reject its previous view of what it meant with regard to the fourth factor in terms of burdens, even while the president is still in office. Am I incorrect? I don't think I dispute any of that, Judge Rogers. I would note, though, that this type of burden, the court did talk about the institutional advantages. You need to check for the long-term interest, and then if you're upsetting the balance between the branches. And if you look at DOJ's last amicus brief in this case, this is a point they agreed with us on, is that this kind of subpoena, even though it doesn't require the president to do very much himself, because of the disclosure burdens, is burdensome in the sense that Mazars met. They agreed with us on that. And the important thing is, you know, Mazars has four considerations, but Mazars is an application of the legitimate legislative purpose test. That's always the test that applies when Congress demands information from someone. The question is just, you know, what level of rigor are you going to apply when you apply that test? Mazars said, you know, here's four considerations that you should apply to balance the interest. And we think Judge Mehta made – we disagree with him, but he made a reasonable conclusion that if the separation of powers concerns are lower here, then maybe I should just apply a lower version of that same scrutiny. But the test is the test. It's a legitimate legislative purpose test. And we think in these circumstances where the subpoena was issued while he was president because he was president to study legislation that would restrict the president, you know, the separation of powers concerns here have faded very little, if at all. Thank you, counsel. Let me make sure my colleagues don't have additional questions for you at this time. We'll give you some time for rebuttal. We'll hear from the committee now. The letter. Good morning, Your Honors. I'm Douglas Leder, the General Counsel of the U.S. House of Representatives. And with me today is Associate Counsel Stacey Fossil. Your Honors, I must start out with one point, and then I want to go into – there was a lot said in my friend's argument that is worthy of being addressed. We urge this court in the strongest possible terms to rule as quickly as possible a panel of this court on which Judge Jackson sat recently issued an opinion very quickly. And we just strongly urge that you do that as well so that the committee has – the Oversight Committee has the ability to carry out its responsibility. As far as jumping right in, Chief Judge Srinivasan, I think you asked one of the key questions about what would have happened if this subpoena had simply been issued after Mr. Trump was no longer president. And that goes to so much of the argument here that I think is flawed of my friend, Mr. Norris. He says, well, it would still be invalid because it's very invasive. It's invasive of Mr. Trump's privacy. Well, that has absolutely nothing to do with what the Supreme Court decided in Mazars. And remember, all of this information, every single bit of it is not privileged. That was made quite clear. The Supreme Court said that. Not only no executive privilege, there's no accountant, client privilege, et cetera. So there's no privileges. In fact, many of these are corporate records. But again, that had absolutely nothing to do with Mazars. Mazars, as you know, and I think your questions indicate you clearly know, had to do with what the Supreme Court viewed as very significant separation of powers issues. But your counterpart. My friend. Your friend. We have argued against each other enough times now that I think we consider ourselves friends. Your friend characterizes Mazars differently than I had thought. And so I'd like your response to that. He suggests that it really isn't sort of separation of powers, that it was about the court being concerned about the subpoena itself and its nature and its thrust and what it was trying to do in a negative fashion to President Trump. So can you respond to that? Yes, Your Honor. I think it's absolutely wrong. The Supreme Court makes quite clear that what they're concerned about is a clash between the branches, an ongoing relationship between the executive and the legislative branch.  But what about this idea that there still is a concern about separation of powers in a world in which former presidents can immediately be subpoenaed for all of their personal records as soon as they leave office? He says that's going to still allow for the kind of leverage over sitting presidents that the Supreme Court specifically identified in Mazars. Why is he wrong about that? Yes and no. He's right. We can see there is a separation of powers issue here. And by the way, I'd like to come back to because Judge Jackson, you asked a question that I think shows there's a very serious separation of powers issue raised by what Judge Maida did here. But going back, yes, Judge Maida correctly said there is at least a separation of powers question about whether there would be so much pressure on the current president if the House went to him and said, you're not going to answer this now. Fine. We know. Boy, are you in for it later? You're going to so regret this. And so here are a list of things we want you to do. We want you to sign this bill. We want you to do this. We want you to do that. Because otherwise, we're coming after you later. Yes, that could be a hypothetical separation of powers interest. It is so far removed from reality, both specifically and broadly. Obviously… Why is it removed from reality? Wasn't it obvious that that was what was going to happen? I don't think so, Your Honor. I mean, no one's going to actually affirmatively articulate it as a threat. But in terms of the likelihood that the subpoena would survive, wasn't that what everybody… In fact, I think the committee said so. Yes, there was definitely a possibility the subpoena would survive. But one big question is would President Trump have gotten reelected, in which case we still would have had the Mazars test, which, by the way… Right, but even assuming he wasn't going to get reelected, I think every… And I think the committee said that. In the Maloney memorandum, at the end of the Maloney memorandum, I believe the committee just said, this is going to continue no matter what. I think you're exactly right, Chief Judge. And so the question, though, is did it have an impact on the presidency? Did it inhibit the presidency as the president carries out his functions? Clearly, it had no impact on that president. President Trump, there's absolutely no evidence of any kind that this had an effect on him. It's very difficult… I don't know what you mean by that, because if you mean that there's no evidence that it had an impact because he resisted, well, sure, but that's never the question. I mean, the fact that somebody actually resists doesn't mean that it doesn't have an effect on the presidency. If there were an actual affirmative threat and somebody didn't give way in the face of the threat, you wouldn't say that there's no problem with the threat because the person resisted. Oh, I think if you were talking about the test here, which is, does this have an impact on the president's ability to do his job? I didn't think that was where you were going at all. Well, I thought your response to Chief Judge Trina Boston's question was that this wasn't about trying to get President Trump to do anything while he was in office, that this was about the legislature believing that it had a factual basis for making legislative changes arising out of some of the conduct that they saw going on in the White House. You're exactly right, and I was going there next. No, that's exactly right. But I think it is both. Did this in some way intrude on or disturb the presidency? That's one question. And two is, as you've said, this wasn't a situation where the oversight committee was saying, you better answer these questions or we're going to issue a subpoena later. And so you better sign such a bill or you better withdraw the funding for the border wall or some way that it intruded on the presidency. It clearly didn't, nor can we think of any situation in our nation's history where Congress seeking information from a sitting president that then might carry over to seeking information from a later, when he's no longer the president, would have in some way disturbed the presidency. Especially because, as I said, one, in every situation, unless the president is actually impeached and convicted, which has never happened, there'll be a new Congress. So one question is, will this actually be a real threat? And two, what impact would this likely have? And so we admit there is this hypothetical concern, but we think it is so weak that basically there is almost nothing here on, as far as the balancing, on the side of the executives. So you don't think the Mazars test, as the Supreme Court articulates it, applies in this situation, or you do? We do not. All right. And if I could right there, my friend said, well, the DOJ does. Remember, as we pointed out to you, the most recent Office of Legal Counsel opinion makes clear that if it applies, it's in the weakest, an extremely weak way. And then that was reiterated. The way the litigation will unfold, then, is the minute that the president leaves office. It's a pending case. Let's say the court of appeals issues a ruling that's predicated on the fact of a sitting president. The president departs office, and the ruling goes against you. Then the court, what happens? The court's decision is wrong because it was under a standard that immediately gets turned off because the president has left office? That's correct, Your Honor. And, as we know, that is correct. Everybody believes that an ex-president can be criminally prosecuted. So that could be the day after he leaves office. Nobody thinks that, oh, he's a recent former president, and therefore he can't be criminally prosecuted. Right, but you wouldn't have had the prosecution before. I mean, in this case, I'm assuming a case that's pending. Well, who knows? Maybe we would have some situation where there was a threat of prosecution. And then, as we know, the moment the president leaves office, everything changes, which is completely consistent with what this court decided the other day in Trump v. Thompson because we have only one president at a time. But there wasn't anything before in Trump v. Thompson. There wasn't something that was in existence at the time that President Trump was in office. That is correct, Your Honor. Yeah, there was. Except, actually, I think I answered too quickly. Obviously, if it was going to be the Congress with the Democratic majority, there was a good possibility that there would be a request under the Presidential Records Act for records of an ex-president. So, yes, that actually was certainly something that anybody could have contemplated. And yet this court clearly thought that whatever effect Mazars had, it was very, very reduced. Well, Mr. Leder, I understand very well what President Trump is saying. And there's a concern, I think, a legitimate concern that arises in the current situation with respect to the financial disclosure and ethics goal. So we were talking about the three tracks. Assuming, for a second, that Mazars' Supreme Court testifies, this subpoena is so broad, it says, it seeks access to this president's personal financial information in a way that I see could certainly be relevant to the goal of finding something that could prompt legislative changes in the financial disclosure. But it seems as though the Supreme Court's test requires that it be necessary, not just relevant. I think that's – am I wrong about that being the thrust of the heightened test? Let's start there. Your Honor, I don't remember the Mazars' opinion saying that information has to be necessary. I don't think the – I don't remember that word. I thought that was the first factor. I'm sorry? I thought that was the first factor, that you needed to be able to demonstrate, you as the House, that you had to rely on this president's information, that you couldn't get it anywhere else, in order to be able to legislate. Does the asserted – what I have written down, does the asserted legislative purpose warrant the step of involving the president in his papers, and other sources reasonably provide them? No case studies are allowed. And so if the Mazars' test applies, we easily meet that because what we're doing here is the Oversight Committee is looking to see what changes should be made regarding financial disclosure forms in general, but more particularly involving president, and particularly involving a president in this kind of situation. What worries me, Mr. Mazars' letter, is that it seems as though Congress could define its goal in such a way that it would make it obvious that the president's records would be necessary when really the committee is just undertaking a fishing exhibition. So suppose the committee says, we suspect that the president may have done something wrong in an area related to our legislative purview, and we want all of his personal records to figure out what he's done so that we can legislate to prevent that wrong thing from happening in the future. Are you suggesting that under Mazars' heightened standard, that would be okay? If I'm understanding your hypothetical correctly, Judge Jackson, that would be problematic if it is just, gosh, this man must have done something wrong, so let's try to figure out what it is. That's nowhere near this case. Why not, with respect to the financial disclosure issue? Yeah, so first look at, well, as we know, the Office of Government Ethics said that as president, Mr. Trump filed forms that were wrong, misleading. Second, we have the testimony of Mr. Cohen. I know he's convicted of lying, but he still said this, not just that he say it, he produced documents that show it. In addition, look at pages 418 and 419, Joint Appendix 418 and 419. That's where Chairwoman Maloney is explaining her rationale here for the subpoena, which, by the way, I kept wanting to say, remember, there is a new subpoena, which is what is before the court now, only issued after his presidency. That makes absolutely clear that there is so much smoke here. But I guess, isn't the answer to that more law enforcement? I mean, if the evidence is that he may have done something wrong, then I'm still struggling to see why legislation is going to be the problem. More legislation. If he broke the law in some way, then the answer should be law enforcement, right? Not more legislation. No, and first of all, this court rejected that argument in its prior opinion, in part, that I don't think the Supreme Court touched at all. So the fact that there might have been laws broken, that doesn't mean that Congress can't investigate to see whether there should be legislative fixes. So this court has already rejected that view, and as you know, we believe that is a precedential on this court, precedential with a C, not an S, on this court. But two, no, as we know, Congress can't do law enforcement. Congress is barred, can't prosecute anybody. But what Congress can do is say, how should we structure financial disclosure laws in the future to take care of this problem, which I'm going to link then to other problems in a moment. And this is something that I think is completely lost in my friend's argument. The Oversight Committee knows they're dealing with a president. So they say, we have to be very careful. But they're not careful in the subpoena. His argument is the subpoena says give us everything. There's no tailoring in the subpoena concerning we're interested in this particular issue, so give us records about that thing. Well, because remember, Judge Meda broke it down into financial disclosure, GSA list, and monuments. But the committee is looking at all three. The committee broke that down. I'm sorry? He didn't invent that. The committee broke it down that way. Right, but what I'm saying, but they're not three separate things that have nothing to do with each other. They overlap immensely. So, for example, if you need to find out for both conflict of interest purposes and the GSA, both three things, and the GSA list and the monuments, what was Mr. Trump's financial situation before he was president? Because, you know, just taking some examples, and again, this is discussed at great length in Chairwoman Maloney's memo. But suppose there has been a debt restructuring in 2015 involving Deutsche Bank or some other foreign entity. If all you look at is 2017, it may be that that looks totally fine. If you're just looking at the situation in 2017. But if you look back and you realize, wait a minute. Well, then why stop at 2011? I mean, you could support a committee subpoena under that logic that goes back forever. In 2011, we wanted to – I'm sorry. Yeah, for as long as Mazars has had a relationship with former President Trump and all the Trump entities, under that logic, the committee could go back forever. And at a certain point, you may say, a court might say, that's just too much. So we tried to make this more reasonable. 2011 is when GSA solicited. So can I ask the following question, which is somewhat in the air with some of the points that you've been making? Part of what's going on here as a predicate for the committee's inquiry is that this president had historically complicated financial arrangements that we just have a hard time getting a handle on. Yes. And we need to have access to the full range of financial statements and all the supporting documents and even the engagement letters so that we can adequately understand his financial arrangements with an eye towards amending the disclosure laws to capture some comparably complicated financial arrangements going forward that future presidents might have. Because we're not talking now any longer about ferreting out potential wrongdoing in the committee's mind by former President Trump. We're talking about the extent to which that informs legislation prospectively that could inform how we configure the disclosure laws for future presidents. Yes. So the more it seems like President Trump's financial arrangements were historically complicated and multilayered and unique, the less it seems like that information is going to be relevant to predicting what a future president might present. So there's something to the notion that what the Mazar Standard is designed to do is to ferret out what's a valid legislative objective and pursuit of a valid legislative objective as distinguished from an invalid legislative objective of exposing wrongdoing for the sake of exposure. And if the way that the inquiry works is this is highly, highly, highly unique, we want to explore it all, even though it may well never come up again, then it starts to look like, well, why look into that highly, highly, highly unique situation to inform future circumstances that are very, very unlikely to present those kinds of considerations again. All very fair points, Your Honor. A couple of answers, though. One, I'm not certain. I think it was at one point we had three billionaires who were – had announced that they were running for president in the 2020 election. So is – President Trump was certainly unique from what came before because – Well, then you can get the information from any of those other billionaires who wouldn't have been a sitting president when the subpoena was – No, but my point is – my point is had one of them been elected, it's not that, oh, my, this would never happen again. I think part of the inquiry here is can you, under the first prong, if other sources could reasonably provide privacy information it needs. And I think part of the point that Judge Mehta was making with respect to this is, well, there are other places you can look to look at complicated financial arrangements, including other billionaires and other people who I wouldn't immediately understand their arrangements, but I could be helped through that. Right. By looking at somebody other than a former – somebody who was then a sitting president at the time the subpoena was issued and is now a former president. And the problem with that – first of all, again, we're dealing with somebody who is not the president. I know Mr. Norris wants you to ignore that, but you cannot, and that's what this court recognized recently. But, no, the problem is we need to look at what happened with Mr. Trump. It's not just what might happen, for instance, with Mr. Bloomberg, because, for example, we know – we have lots of smoke that there were serious problems that could have gone to major national security concerns because of Mr. Trump's financial interests with, for example, Saudi Arabia, Turkey, and Russia. But isn't what makes the Mazars test a heightened test that you would need to say more than just generally we have lots of smoke here? You would need to say what it is that you're looking for in his records, why you think, if you find it, that's going to inform or advance some legislation. I don't know what makes the Mazars test heightened if you can just say we think that there's a lot going on with the former president and his finance. You're right, Your Honor. The Mazars test means you have to show more, and that's why the Maloney 50-something page memorandum does explain the more. And by the way, the October 8th letter from the committee back to GSA that Mr. Trump submitted to this court, we'd be quite happy for you to look at that because that also shows that we clearly need to heighten standards. There is so much smoke here, it's blinding, and it's hard to breathe because there's so much of it. And I'm quite astonished by my friend's argument that, oh, there's nothing here. There's page after page that Chairwoman Maloney explains of problems. And so then Mr. Norris said, well, ask GSA. Well, the problem there, one, we have asked GSA. We've gotten some material from GSA. We haven't gotten everything, but here's a key problem. Do you have everything that he gave? That was one particular point. Everything that President Trump gave to GSA to evaluate leases, your friend says you have. I believe the answer is no. I'm asking my associate to write that down and so we can check, but I'm fairly sure the answer is no. But here's the key point. Even if we had everything, that assumes that what Mr. Trump was submitting to GSA was accurate, and that's exactly one of the problems. We know that there were serious, serious problems with things that Mr. Trump would show to entities like GSA or to a bank, which would be very different from what was shown to tax authorities, et cetera. Now, who knows? Maybe that's legal. It may very well be. I'm not saying it isn't. What I'm saying is there clearly is enough that we would want to, for example, should we say that a financial disclosure must include what you have submitted to a government entity before, and it must be consistent with generally accepted accounting principles, because it appears that what was submitted to GSA was not, even though I think GSA required it. But it appears it was not. So that's one of the reasons we want to talk to see what Mazur's has. Mazur's the accountant, so we want to know when Mr. Trump hired you, retained you, what were the terms? Were you supposed to just – were you a pass-through, basically? Or were you supposed to employ gap to see whether this is an accurate portrayal or not? And, again, there is a massive amount of smoke here. Shouldn't the subpoena say some of this? In other words, if there are particular kinds of documents, if there are particular reasons why, I'm just a little concerned that the subpoena is so broad that we have these memos coming shortly before or after that sort of talks about it and tries to put it into context. But wouldn't part of the Mazur's test be to ensure that the subpoena itself is capturing the kinds of things you're talking about? We're looking for – I was actually surprised when I looked at the subpoena in conjunction with the memo, because I had expected that the subpoena itself would have these categories, for example, these tracks. We are interested in GSA financial disclosures and emoluments with respect to GSA. I'd like to see records 1 through 50. That's not the subpoena. And so the work – the subpoena raises a question about whether what's really going on here is more of the kind of dragnet fishing expedition that we all agree the Supreme Court says you can't do. The Supreme Court said you can't do to a sitting president. Again, remember, our argument is Mazur's does not apply, and it's a very, very strong argument, and it's extremely close to what this court has recently said. But wholly aside from that, Your Honor, I think you're assuming that we know a lot more than we do. You're assuming that we know that the financial statement submitted to thus and such on thus and such a date is something we should be looking at. Well, we don't know. Maybe there are all sorts of documents out there, and we don't know what Mazur's did to them. We don't know how they were crafted. For all we know, remember, one of the things we've asked for is background documents. Is there a document from Mazur's, Mr. Bender is the one who's mentioned this subpoena, back to the Trump entity saying we've noticed a major discrepancy between this and that, and we're concerned about our accountant's license, actually, if we submit this. Can you explain this? And, James, just to be clear, suppose that there is such a document. The reason the committee wants that document is because it's going to inform the committee as to what to do with financial disclosure laws dealing with future presidents. So we're looking at one particular person said to the former president at one particular point in time that it can inform disclosure laws vis-a-vis future presidents that will never have had the same kind of interaction with that same person. Yes, because, again, remember, it's not just financial disclosure. In monuments, for example, what was the relationship between the president and foreign entities and foreign banks? We know, we've learned that there was some sort of renegotiation, some sort of terms were changed before Mr. Trump became president. But then when he's president, does that mean that he was paying less on a debt than he would have been before? And, therefore, that would very likely be in a monument. Should Congress pass legislation attempting to define the monuments? In the monuments one, at least a couple of the facts, the financial disclosure tract seems to me to be the one that gives you the broadest access to documents. But I may be wrong. It gives the broadest access to documents if that one's sustained. The lease one is a pretty specific rationale. The idea that the full range of the subpoena can be justified by the lease tract seems tough. There's a lot of entities that don't have much to do with any lease. There's a lot of time that doesn't – well, the time part of it actually is closer on the lease because the lease started in 2011. But the entities and the scope of documents that are requested, they seem pretty far removed from a specific lease about the post office. And, again, Your Honor, that's why these are all interrelated. It was a single subpoena that had very – So would you agree that if the only tract that was asserted by the committee was the lease tract, that the subpoena is too broad? I'm not sure, Your Honor, because we don't know – Even with the entities? Well, because – yes, because there were – remember, we asked for documents from five entities and just made a mistakenly thought that only three of those entities were involved with the lease. But the Maloney Memorandum and the October 8th letter shows that all five were indeed involved with the lease. So we – remember – So concerns about a specific lease about a specific property between the former president and GSA allow access to eight – is it eight years? Is it 2011 to 2018 is what we're talking about? Yes. Eight years of every financial record that the president has with Mazars. Well, no, it's – remember, it's only records that Mazars has. Remember, the subpoena – That's right, the Mazars. Well, I'm sorry. Yes, sorry. Yes, with Mazars. Because you haven't asked the president directly, but – former president directly, but with Mazars. Every record that the Mazars has vis-a-vis this client and the complex of entities. So if all we were doing was looking at the GSA lease, it might very well be that we would say it has to in some way pertain to the lease. Yeah, that could be, yes. So, I mean, and those are the letters that the committee has given to GSA. The letters that the committee has given to GSA to ask for information, they're not asking for every possible thing. Well, the GSA wouldn't even have it. Correct. But they're tailored to the lease. Yes. So it seems to me that the scope of the subpoena is quite out of whack with the lease track. Maybe I should have answered Your Honor's question differently. If all we were doing was looking at the lease, the subpoena would probably have been written differently, yes. But that's not what we're doing. Not just the financial disclosure, then we also have the emoluments. The emoluments does require something very broad, because that's not just about the GSA lease. That's one of the most important points. And, by the way, I don't want to forget this, so I'm just going to interrupt myself to say, remember, the domestic emoluments clause applies only to presidents. So if there are concerns there, which there are, we have to get information about presidents. He wasn't president in 2011. I'm sorry? He wasn't president in 2011. Correct. But that's when, as I said before, what Chairwoman Maloney points out is there are so many interconnections and complexities, as far as what Mr. Trump has done with his various entities, that we need to see what's the relationship between them. And we need to see, I repeat, if some sort of financial arrangement with a bank, a foreign bank, was renegotiated in 2014 or 15, that very well could mean an emolument in 2017 or 18. So we would need to go back some years to look to see this stuff. Can you just take a moment to talk about remedy? About what? About remedy. Remedy? By remedy, I mean, excuse me, I apologize. No, I apologize. I know. I'm having trouble with the mask. I apologize. So if we disagree with aspects of your argument and the result is that we think that some parts of the subpoena or some tracks are okay and others aren't, sort of along the lines of what Judge Mehta did, is it your position that we have the power to tailor the subpoena or to just cut off those parts and say the other part is enforceable? We have to apply some sort of severability analysis. How do we go about thinking about that? Yes, is the basic answer. Yes. There's no law that we're aware of that you can't or shouldn't say, like Judge Mehta did. We think he drew the wrong lines. But we think, yes, you would say 2017 he was wrong. But if you think that 2011 or 12 is too far, even despite the documents that we have submitted, yes, there would be no reason at all to void the entire subpoena. This is not a criminal case, which is what my friend Mr. Norris has been relying on, criminal cases. And, again, we're aware of no reason why it wouldn't be. Well, would the criteria at least have to be somewhere in the subpoena? I mean, for example, suppose the committee issued a subpoena that says we want every document that Mazars has that's associated with former President, well, then sitting President Trump and all the Trump entities. And we recognize it might be a little bit broad, but then a court can go through and figure out what the scope of the subpoena should be. I don't think we would ever do that. If you actually issued that, I don't think you would say the last part, but you might issue a subpoena that's that broad and then leave it up to a court to narrow it. Is that what a court's supposed to do is to figure out, okay, there's a really broad subpoena, and what we're going to do is just narrow it to what we think the committee could have permissively done? Your Honor, there's a presumption of regularity that applies to Congress as well. I can't imagine that Congress would ever say, look, let's just send a really broad, an overbroad subpoena, and if there's a problem, the courts will figure it out. He's not talking about the intent. He's not talking about the intent. He's talking about the power of the court. Right. Is it up to the court to craft a subpoena that the committee did not? Yes, but, and this gets back to the separation of powers issue. Remember, it's in general not the job of this court to be rewriting subpoenas. Just like, for instance, if you said to me, hey, Mr. Levin, we really want a supplemental brief on X, I wouldn't even dream of saying, no, no, the House of Representatives, I'm telling you, you don't need that. You shouldn't ask that. I don't understand your argument, Mr. Letters, so maybe I heard you. You have the authority to cut back on a subpoena, but remember, you should do that only when it is clear that it is something that is beyond the power of Congress to request a subpoena. That's right. So everybody, I think, accepts that premise, which is that you have to be wrong on the scope of the subpoena to begin with before we can talk about narrowing it. But in terms of the court's obligation to narrow, I'm not even assuming bad faith on the part of the committee. Let's just suppose the committee, in very good faith, says we think that our prerogatives, legislative prerogatives, support looking at every document that Mazars had that's connected to former president – then sitting president Trump, now former president Trump and all the Trump entities. But it's possible the court's going to disagree with us, and if a court does disagree with us, then the court can just narrow the subpoena to what's permissible. Would that be okay? When you say would it be okay, would it be within the power of the court? I'd say yes. As opposed to saying the court should strike it down and let us be the one to come back and tailor it and make it consistent with what the court says is lawful legislative authority. I would say no, because in issuing the subpoena, the House already did what it thought was appropriate and is defensible. If the court says what you did is so indefensible, it's not related or pertinent to legislation that could be had. Remember, that standard is amazingly broad. If you ruled officially – No, it's not about whether the legislation could be had. I mean, I think we're acceding to the notion that legislation in the area could be had. Yes. But it's not void because it's in pursuit of an improper objective. It's a proper objective. It's a field in which legislation could validly be enacted, or at least we can't reliably predict that it would be invalid. But the subpoena is just too broad. And then the question becomes, if the subpoena is just too broad, is it incumbent upon the court to refashion the subpoena in a way that would be valid, or is it incumbent upon the issuer of the subpoena to refashion the subpoena? Your Honor, it could vary depending upon the situation. But in this situation, I don't know why there would be any reason why you wouldn't do exactly what Judge Maida did, except, as I say, with paying – sorry to repeat it, but paying appropriate deference to – if there is – we've agreed in the hypothetical, there is legislation that can be had. The subpoena is valid, but might be overbroad over here or over there. I don't know. In me, it seems to me what's relevant is what the over here and over there is because if it's reducing the number of years, that seems pretty concrete and easy because the subpoena just reads in terms of the number of years. And if it were as easy as saying years X and Y are off limits, years Y and Z are on limits – I'm sorry, X and Y and then Z is on limits, that would be one thing. But if it's refashioning the scope of the subpoena in terms of the documents that are being requested from a particular entity, that seems like a more subtle exercise. I guess I'm a little hard-pressed to think of a situation where the court finds that the subpoena is – has a valid legislative purpose and the – it – like here, it involves specifically defined types of documents and specific years. If the court were – there would have to be an amazing situation before the court would say, no, no, this is too broad. Well, I don't – I think Mazars calls on courts to do that kind of thing. If you assume Mazars applies. So let's just assume it's a sitting president. Let's just make it easy. Okay, if Mazars applies. Assume it's a sitting president. I think Mazars calls for that because it asks – can't rely on information if other sources can reasonably provide it. That may not be something that's within the four corners of the subpoena. It may be that other sources supply some information that's within the subpoena but not others. And then there's another criteria that says that it can't be no broader than reasonably necessary to support Congress's legislative objective. It may be that some aspects of the subpoena are broader than reasonably necessary and other aspects are not. So you could have a situation in which you have to fashion a subpoena that's narrower in ways that are not immediately obvious from criteria that are set out in the subpoena itself. Well, I guess my other response is that's exactly what happened here. The Supreme Court changed the rules as it can. The Supreme Court said here's the new test, and we said we can make that test. But you issued the subpoena at issue here after the Mazars ruling, correct? Yes, but it's the same. I understand, but you had the opportunity to tailor your subpoena to what you understood the Supreme Court to be requiring, right? Absolutely, Your Honor. And other subpoenas, as was pointed out by my friend Mr. Norris, some other subpoenas were more narrowly tailored. Here, again, this was the exact point of Chairwoman Maloney's very long single-space memo was to show Judge Meda to show you, if necessary, to show the Supreme Court. But as a result of that, why doesn't it all rise and fall with this Court's interpretation or ultimately the Supreme Court's interpretation of the breadth of the subpoena? In other words, if you knew that the Supreme Court was saying here's what you have to do under these circumstances, and you issue a new subpoena that, let's say, doesn't conform. Right. Why is it the responsibility of this Court to carve out the parts that don't conform, leaving the rest intact, as opposed to saying, this subpoena, Congresswoman Maloney, thank you for trying, but you didn't quite get it in terms of your explanations or whatever. So if Congress would like to do it over, they have the opportunity to do so. They hate it. Why not that as the remedy? The reason is because this Court, in issuing that decision, it would be totally inappropriate for this Court to say, you know, you tried, but it's just too broad. That's not what you would do. You would say, Judge Meda, it's too broad because you could get this information from GSA, or it's too broad because you're going back too far. Yes, we say all of that, and there are parts that are untouched. The question is, do we only vacate or invalidate the parts we talk about specifically in that way? Or do we say, we are giving deference to you, Congress, in light of our determination, to go back and figure out how you want to go about getting the rest of the information? First of all, it's not an either-or here. Suppose you, this Court rules that the following years' entities don't meet the test. You would tell us that in an opinion. The rest of the subpoena, though, would be valid, and therefore you wouldn't have any reason why you would overturn it. Ms. Maloney, Chairwoman Maloney, could then, and so that subpoena would be valid, and that would be enforced, except insofar as you struck it down. And then Chairwoman Maloney could say, oh, you know what? We actually can, on one of those, we now have more information. We can show that 2011 actually is key. So I'm going to go back and try again with a new additional subpoena that would address the things that you thought were invalid. But I can't for the life of me figure out why, if you don't have a problem with parts of the subpoena, why those would be struck down. I don't know why that would be. But again, we could then, yes, we could fix the parts that you said, unless you said there is no possible way this could be fixed every once in a while. But otherwise, sure, we can go back and fix it. If we think that's a reasonable use of committee resources, etc., then we certainly could do that. So that's why I don't think it's an either-or. Can I ask one question about a different part of the arguments that you put forward in your briefing, which is part of the arguments in the briefing is we need this information because it will inform us as to the contours of future legislation. We have to understand what the deficiencies may be. The best way to understand the deficiencies is to understand the financial state of the former president, and that will inform us going forward. Another part of the argument, though, is that if we can get access to this information, it may persuade legislators to come on board. And, for example, it's the Senate that's out there. Maybe there's some House members you'd like to bring on board who aren't already on board, but there's other legislators. As to that aspect of the argument, if it's invalid to have exposure for the sake of exposure, is it valid to have exposure for the sake of exposing it to other legislators? No, it is not, Your Honor, because exposure for the sake of exposure, and remember, you know, the language is in several Supreme Court opinions, and it's also tempered in those very same opinions. What the Court has said is if you're just exposing private matters for embarrassment, et cetera, that's one thing. But it's not just private materials for embarrassment if you're saying, we now have this material, and we think it shows that the bill ought to be framed in such a way, and we know that there are skeptics in the Senate, because the skeptics already rejected H.R. 1. And so for the legislative process, it's not just exposure for the sake of exposure and embarrassment. It's so that we can convince ourselves that something is necessary, and we then present it to the other chamber and to the sitting president to say, here is why. So is that type of logic going to be available every single time there's exposure for the sake of exposure? You can always, legislatures can always add on, oh, by the way, it's not just for the sake of exposure. It's so that people will be persuaded. I wouldn't think so, Your Honor. It would, again, if what, you know, back to the, when the case was argued earlier, you know, I was asked things like, well, what about the president's diary from when the president was 12 years old, something like that. I doubt that we would ever be able to match that with something that would convince senators that this is a good bill. But your point that it's exposure for, in service of legislation, that the reason why it's different than what Chief Judge Trinovastan just pointed out is that it's not just exposing people, exposure to prompt legislation necessarily, but it could be exposure to demonstrate why a draft bill or something like that is necessary. And I would think often properly limited. You know, again, remember here, we would be, we're very cognizant of the fact that we would be legislating in ways affecting the president. We have to be worried about separation of powers concerns. We have to be worried, is the president going to sign this? So there are ways that we might then say, okay, we originally thought it'd be a good idea to, you know, add another provision, but the information we got just won't really support that fully, just partially. So let's leave that part out. So it's all about crafting the legislation. Can you speak to confidentiality? That seemed to be a big point that your friend brought up. Absolutely. It is a very major part of their argument. And it's wrong. Remember, we quoted from our brief, you know, and Mazur's quoted it too, the point about much of the purpose of Congress is to look into what the government is doing and discuss it and have it, you know, part of the public discussion. Obviously, as we know, it has to be tied to legislation. That's fine. The Oversight Committee, in particular, operates in public. So think about how we would do, how would we possibly do legislation here if it was confidential? It would have to be. I can't imagine a circumstance when we would be saying to the 430th member of the House, you know what, we've shown this already to 429, we're just not going to show it to you. Clearly, it has to be available for all members of Congress, right? They're being asked to vote on something. Mr. Letter, Congress has often faced this dilemma, has it not? And it has figured out ways that can protect the individual as well as the institution. And what I'm concerned about here is this is not simply a subpoena coming to the court in the context of a private civil action or even a government action against a private party in the traditional sense. So my concern here is I know the Supreme Court in Eastman talked about, you know, the committee doesn't have to give us a chapter and verse. We want to be sure it's serious. We want to be sure it's just not a fishing expedition. And so Congresswoman Mahoney goes on at great length. This court may not agree with everything she says, but the question is sort of what is our role here? And I think what you're being pressed and you're trying to be responsive, but I'm concerned that the court not view itself as some sort of superintendent here of the committee's decision in terms of what is a relevant inquiry for purposes of future legislation. Even if it proves to be wrong. So with that introduction, the district court says, look, current law requires candidates and the president to disclose tons of financial information. And furthermore, no one's mentioned it, but a president has various options. And as we know, previous presidents who have been financially very well off have used the blind trust option. Others have simply disclosed. So it's not as though the current system does not take into account some of these questions we're raising. So given that context, the district court says, look, I'm trouble. The questions here suggest that Mr. Trump's argument is serious. The committee says, we understand he is a former president. We understand he is concerned, obviously, about his political future, much less his own personal privacy. And I'm just wondering whether the court's role isn't limited and it may be limited in ways that the committee itself has to determine how to proceed. I mean, there are many people in Congress who may be thinking of running for office again, and they understand that while your law may speak specifically to a president, it can affect them as well. So this very fine line that at least I thought Eastland tried to clarify a little makes me nervous about this sort of very active approach where the court rewrites the committees, well, where the one branch is rewriting the subpoena of another branch. And I want to know just how far you think our authority goes in terms of what we are concerned about in terms of not only the former president's concerns, but the ability of the House to carry out or the Congress to carry out its legislative responsibility. Very fine lines. And if you say Maser, the Maser test for presidents is met here, were we to agree with that, then that is the end of our discussion. I gather you say, well, we could say, sure, for 2014 to 15, but not back to 2011, despite the explanation that you've given. Can you just discuss that a little more? Yes, I'd be happy to, Your Honor. I think there are some very important points in your question. I agree completely with you that if the Maser's test is met, then I think you're absolutely right. And the court's function is done. And I do think that, again, one of the key points in your question is something that Judge Jackson, I believe, started the argument out with, which is this court obviously has to be very concerned about the separation of powers because it should not be supervising Congress. So I think in some of the answers that I've given already, but I want to reemphasize them in light of, again, the point you've made is that this court would only strike down something if some part of the subpoena, if it really is quite clearly beyond Congress's authority. And, in fact, there aren't many Supreme Court cases or cases from this court where you find that the courts have said, well, this subpoena has a valid legislative purpose, but this one point just goes too far. In McGrane, for example, which is, I think, the seminal case in this area, the Supreme Court unanimously said it's a question of could legislation be had, and then it made clear that you basically ignore the political chatter and the political screaming and yelling, and you leave it to Congress to determine is this something that relates to, is pertinent to, and pertinent meaning, in a very broad sense, Congress's purposes, valid legislative purposes. So I take your question very seriously, that these are the exact things that this court should have in mind, and why we think Judge Maida, while he got a lot right, he erred in just too loosely said, well, you could get this information elsewhere. Which, again, we think Mazur's is not applicable here, and so that would not be a factor to be taken into account. As I read the district court, he said more than that, and I just want to be clear on your response to that. He said not only did he think you could get it from other sources, other billionaires, and had a footnote mentioning one in particular, and I wondered sort of what obligations that person who served in the administration would have to cooperate with Congress. But the other point he made was because the current law requires so much to be disclosed, so that there's already a lot of information out there, and the committee has indicated it wants to move incrementally. And so he thought it was appropriate, as I understand it, for a court to take that into account in deciding to reform the subpoena. What's your response? Because you know what we're going to hear on rebuttal is very much the type of argument that appellants presented in opening and in their brief. The response, Your Honor, is that we do believe there that Judge Maeda erred, and you're right. Judge Maeda gave different rationales for the three different categories, and you're absolutely right. For financial disclosure, he said there already is significant disclosure, but that's exactly what we say we need to look into. We know there's significant disclosure already, and we think that is constitutional, and we want to figure out how much more is appropriate without becoming unconstitutional. And that is a judgment, the judgment for the House to make as far as how the legislation should be crafted, and therefore what information might be relevant to making that determination. We think it should be an extremely rare instance where a judge would say, I think you already have enough information. And in fact, it's very hard to see how Judge Maeda could have thought that, since Judge Maeda, this isn't a situation where there's privileged information that the judge has seen in camera. And so the judge can say to us, I've looked, and there is nothing here that is useful for you. Judge Maeda is as ignorant as we are, so I'm obviously not using that term pejoratively. He doesn't know what's in the other materials. Then Judge Maeda said for the GSA lease, he limited it to three organizations. Just frankly, we think this is an obvious error because, as I mentioned already, her August memorandum and the more recent October 8th letter to GSA shows that there were all five organizations that we are covered by the subpoena were very heavily involved in moving money among each other and affecting each other's financial positions. And on emoluments, as I think I've said already by saying two years, that frankly doesn't make sense when you're dealing with a complex financial situation of trying to figure out how far back you go. My own financial situation is such that it's basically my salary, so it's whatever comes in every year. But I think Mr. Trump's situation is quite different from mine, and you need to go back, at least we think, to 2011 when GSA solicited bids. I hope I've addressed the very serious and valid points that you made, Judge Rogers. Thank you. Jeff, one final question. So I take it you would have us hold that the Mazars Heightened Scrutiny Test does not apply because what is being subpoenaed now is the records of a former president, not a sitting president. But do we need to ignore the fact that the subpoena, the content, the intention of Congress to subpoena this president occurred when he was a sitting president? Your friend keeps pointing to that. He keeps saying, yes, I understand that we have this distinction now that he's no longer, but the House initially subpoenaed him and sought this information while he was a sitting president. That's correct. So why wouldn't the Mazars test apply on that basis? And, you know, you've heard some of this before from me, but I'll say it again. As your panel said, side of the law, says this, but any number of Supreme Court judges say it, we have only one president at a time. So to the extent there are separation of powers issues in Mazars, which that's really what the opinion was about, those are, as I've said, virtually irrelevant with this one minor aspect about, well, would it have an impact on the presidency? And by the way, I have heard that argument. What I'm trying to suggest is do we have something like a continuing violation issue? This comes up in a totally separate section of the law, but the idea being you might be right that Mazars doesn't apply if the original subpoena arrived at the president's Mar-a-Lago home after he was done. But to the extent that it started while he was president, why shouldn't we say that notwithstanding the fact that he is no longer president today when we're ruling on this, the applicable standard should be the one that would apply to sitting presidents? And again, I come back to, and I think this was one of the early questions from Chief Judge Srinivasan, if this subpoena had come in today, would there be any problem? I think the answer is obviously not. And it is because the Constitution does draw a clear line between a president and an ex-president. An ex-president is somebody who rejoins the great unwashed. And for example, we know that, one, because any number of Supreme Court decisions tells us we have only one president at a time. OLC is saying you can prosecute somebody who's no longer president. In addition, we mentioned in our brief the incompatibility clause, which says that nobody in the executive branch can serve in Congress. Well, the moment you're out of the presidency, it could be, let's say, for example, two terms are done. On January 20th, you're no longer the president. On January 19th, let's say a senator had passed away and a governor is thinking about naming, let's say under state law, the government gets to name the person to go into that Senate position. On January 19th, the governor could not name the president. On the afternoon of January 20th, he could name the ex-president. And it wouldn't matter that he's a recent ex-president. He is not the president, and therefore, as Mazur's talked about, the hydraulic pressure between the branches is gone the moment he is no longer the president. Thank you, Mr. O'Reilly. We have additional questions for you at this time. And I know you're across the phone, so we'll give you a little bit of time for rebuttal on the cross-appeal. Mr. Norris, why don't we give you four minutes for rebuttal? Thank you, Your Honor. I just wanted to talk about the issue of remedy, which I didn't get to discuss on my part. We do think the rule from this court's decision in Patterson that says a subpoena from Congress must be good in its entirety applies to this context. Patterson, of course, is a criminal case. This court has no case that says in an injunction case there should be a different rule. In fact, my memory is that in Senate Select, the court struck down the entire subpoena or declined to enforce the entire subpoena. Is that a criminal context, too? Senate Select was an injunction that Congress tried to bring against President Nixon. I see. And, of course, that rule is a good idea here. It prevents interbranch conflict by making Congress do the hard work of narrowing its subpoena before it's issued. And that's a major theme of the Mazars' opinion, that these things should stay out of court. The way to do that is to put the onus on Congress to come forward with a narrow subpoena. My friend says that we would never issue such a subpoena that was grossly overbroad. But we have this case and this subpoena, which is, of course, massively overbroad compared to the legislative objectives that have been offered. It also prevents courts from tinkering with subpoenas. Subpoenas are not statutes. They're not part of the public law that everyone can interpret and enforce. They're sort of the internal machinery of one House of Congress, much like the rules, which this court has said we would be very hesitant to start rewriting the House rules ourselves, in distinction to a statute. And I think not applying the Patterson rule here was – we saw how it played out with Judge Mehta. You know, I think he found parts of the subpoena unenforceable, which we agree with those parts of his opinion. But then he had to do a sort of rough-cut separability analysis. He said, only these custodians and only these years. But that didn't really address the overwrought problem in the case. If you look at the emoluments rationale, Judge Mehta said you can only have 2017 and 2018 when he was president. But he didn't go on to say you can only have documents that would reasonably show emoluments, which are payments from domestic or foreign governments. Because I think, you know, to his credit, I think he didn't feel comfortable going on and saying I'm going to rewrite this so that you're now requesting things that you didn't request originally. And with the lease rationale, Judge Mehta said you can have these three entities, which, by the way, are the only three entities that were addressed in the Maloney memo. And Judge Mehta asked my friend at argument, you know, which entities are covered by this rationale. He didn't list all the entities he's trying to list for the first time on appeal. But anyway, he listed it. He limited it to the entities. But, you know, he didn't limit it to documents that went into the GSA lease. He didn't limit it to 2011 when the bid was made. He gave them everything from every document, lease-related or lease-unrelated, from every year. So the rule in Patterson, you applied it. It would make them go back to the drawing board, but it's not like they couldn't come back with a new subpoena. I see a sort of tension in this argument in terms of congressional, excuse me, court power that I'm interested in, which is, on the one hand, you say with respect to the determination of whether or not Congress has exceeded its authority, you want the court to dive in. You want us to dig deep, figure out exactly what their rationale is, what documents they're looking for, make them provide, you know, sufficient justification. But when it comes to what happens on the back end once we agree with you that they haven't done enough or that they, you know, are overbroad or whatever, you want us to stay out of it and don't help to, you know, recognize the portions of the subpoena that they actually got right and that were valid. Isn't there an inconsistency in terms of what you say the court should be doing in that line of thinking? I don't think so. I think it's a constitutional versus non-constitutional distinction in part. This court has to apply the Constitution. It has to make sure Congress stays within its Article I authority with these subpoenas. And to Judge Rogers' point, there was supplemental briefing that was requested in Mazars by the Supreme Court about whether this is a political question that the court should just stay out of entirely. Both sides said no. May I finish? Yes. And then the Supreme Court said no, that there is a role for the judiciary here. Mazars uses interesting language that says courts should insist on a subpoena that is no broader than reasonably necessary, which I think supports the remedy that we want here, which, you know, is an exercise of remedial authority. And it's not like we're asking you to, you know, enjoin Congress or, you know, issue an order that will bind a colloquial branch. In this case in particular, we have Mazars here. All we need is a declaration. The subpoena is invalid as written. The court could explain how it's invalid in the opinion. That would be enough to give us relief. Congress would go back to the drawing board. Thank you. Thank you, Mr. Norris. Mr. Leder, we'll give you a little bit of time for a little too. Why don't we give you – we'll give you four minutes just as a matter of equivalency, but you're not required to use it. Your Honor, I feel like I spoke enough. I didn't hear anything in this rebuttal to reply to. If the court has any further questions, I'm happy to answer them. Otherwise, I thank you for your time. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Rogers, Jackson